## EBENEZER G. WHITING, *Complainant and Appellee,*

*vs.*

## EDWIN GOULD and JAMES R. HAWKINS, *Defendants and Appellants.*

.APPEAL FROM THE CIRCUIT COURT OF RACINE COUNTY.

On a bill in equity, the complainant must recover, if at all, upon the case made by his bill, whatever the proofs may be.

Where the recital of a valuable consideration, through fraud or mistake, and against the intention of the parties, has found its way into an assignment, a court of equity should admit parol evidence of the absence of any such consideration ; but, *unless* such fraud or mistake is shown, proof of this kind i[s] inadmissible for the purpose of destroying the effect of the assignment.

Where no objection is taken to the transfer of a written instrument, on the ground of fraud, mistake or surprise, parol proof of a want of consideration, in order to render such transfer of the instrument inoperative, as a mere voluntary conveyance, is inadmissible.

Where D. assigned, by writing, for a consideration expressed, a contract for the conveyance of lands to C., vesting absolutely in C. all the right, title and interest of D. in such contract, it is incompetent to show by parol, that the transfer of such interest was intended to be merely in trust for D., being in contravention of the Statute of Frauds.

The Statute of Michigan, in force at the time of the transactions set forth in this case, provided that all declarations or creations of trust or confidence, of any lands, tenements or hereditaments, should be manifested or proved by some writing signed by the party.

This statute created a rule of evidence, applicable to trusts in lands, requiring that they should be manifested or proved by some writing ; and as the transactions set forth in this case fell within the operation of said statute, and were evidenced by no written declaration, no trust could arise therefrom.

No express trust in lands is valid, unless the same is manifested by some instrument in writing, nor can such trust be established by parol proof.

But these provisions do not apply to such trusts as result from the transaction of the parties, or to such as are implied by operation of law.

Express trusts are made void by the statute, unless declared in writing. Implied trusts result from the transactions of the parties, by operation of law, and not from their understanding or contract.

The Statute of Michigan, above referred to, gave place to the statute of the Territory of Wisconsin on the same subject ; and under the sixth section of the latter statute, an express trust could be created only by a deed or conveyance, and not by parol ; while an implied or resulting trust might be created or raised by operation of law, and proved by parol ; because it had its origin, not in any contract or agreement of the parties, but in the absence of any agree-

ment—it arises out of the transaction merely. The latter is but the creature of equity; the former is the result of compact. A trust by operation of law is entirely inconsistent with even a bare declaration of trust by parol.

An agreement cannot rest partly in writing and partly in parol, because the written contract excludes any previous parol agreement, when there is neither fraud or mistake in the transaction, and furnishes the most reliable evidence of what was intended by the parties.

A resulting trust from the advance or payment of the purchase money for an estate, must arise or spring into existence contemporaneously with the execution of the deed of conveyance, or the payment of the purchase money.

Where a trust may be shown by parol proof, it may in like manner be destroyed or overthrown by parol proof.

In a bill to enforce a trust in land, it is not necessary to aver that it was created by deed or otherwise, because the court will infer that it was created in the manner required by law, unless the contrary appear. But if the answer deny the existence of any trust, the complainant must prove the creation or existence of the trust by competent evidence.

If a defendant admits an agreement or trust, but insists on the Statute of Frauds as a defence, the court will not permit his admission to override the positive provisions of law, unless the statute is sought to be made a cover for fraud, and will not decree against the defendant; but if, after admitting the agreement or trust, the defendant does not rely, by plea or answer, on the statute, a decree may be rendered against him, because he may be deemed to have renounced the benefit of the statute; and no objection to the nature of the proof can be offered, because the agreement or trust is admitted, and therefore no proof of any kind is required.

If A. purchase land of B., and pay his money for it, and take his title in the name of C., a trust results, by operation of law, in C. for the use of A. This trust arises, not from the agreement, but from the transaction of the parties; it flows or results from the payment of money into the land. *Smith, J.*

For other points as to express and resulting trusts, see opinion of *Smith, J.*

Dec. Term 1853.

Whiting vs. Gould.

The bill of complaint in this case states that on the 20th day of February, 1839, the complainant contracted by deed with Truman G. Wright and Gilbert Knapp for the purchase from them of three certain village lots in Racine, for the consideration of $500 paid at the time; and thereby agreed further, with Wright and Knapp, to build a dwelling house of certain dimensions on one of the lots within a year, and a furnace on another of the lots in eighteen months; and Wright and Knapp, in consideration thereof, agreed to convey the lots to the complainant; that this agreement was recorded; that the complainant built the house according to the contract; that, in

the same year, the complainant's sister, Mary E. Whiting, and his mother, Elizabeth Whiting, entered into the possession of the premises as his tenants and agents ; that in the same year the complainant left Wisconsin, and resided out of it for several years, leaving Mary and Elizabeth in possession as his tenants and agents ; that in the same or next year Wright and Knapp's title became vested in Lorenzo Janes, subject to the complainant's contract ; that on the 18th day of July, 1840, Janes conveyed the lots to Mary, and Mary executed a mortgage thereon to Janes for $200 ; that on the 6th day of January, 1842, the defendant Gould, having notice of complainant's interest in the premises, intermarried with Mary, and entered into possession of the premises, and acted with his wife as complainant's agent ; that on the 16th day of June, 1843, Gould's wife bore him a daughter, called Mary Elizabeth, and soon after died, and that the child died about the 1st day of May, 1844 ; that during Mary's life, Gould and she sold two of the lots, and mortgaged the third lot (on which the house stood) to John Richards for $200 borrowed by Gould; that after the death of Mary, Gould drove Elizabeth from the premises ; that the mortgage for $200 was paid by and assigned to Gould ; that the defendant Hawkins, having full notice of all the facts, and combining with Gould to defraud the complainant in the premises, for that purpose entered into an agreement with Gould to purchase the remaining lot on which the house stood for one thousand dollars, to be conveyed to Hawkins when Gould could procure a title and cut off the complainant's interest. That about the 16th day of October, 1842, Gould borrowed four hundred dollars of one John Richards, payable in

eighteen months, with interest at the rate of twelve per cent. per annum, semi-annually, and intending to defraud complainant, procured the said Mary to join with him in executing a mortgage upon said lot 10, to secure the payment of said sum so borrowed of Richards; that the said Gould and Hawkins, for the purpose of effecting such purpose, agreed that said Gould should make a nominal assignment of said $200 mortgage to said Richards, and that a bill of foreclosure should be prosecuted in the Racine District Court, to foreclose the said $200 mortgage and the said $400 mortgage, and that the said lots 8 and 10 should be sold under a decree of the court, and that Gould should bid them in, and convey them to said Hawkins; that both Gould and Hawkins knew that the $400 mortgage was not then due by its terms; that in order to carry out the arrangement, a bill of foreclosure was filed in said court in the name of Richards, against the said Edwin Gould and Mary Elizabeth Gould, infant daughter of said Edwin Gould, as defendants, on the 22d day of May, 1844; that at the time of filing the bill, no part of the $400 mortgage was due, and that Richards claimed no right to foreclose the same; that during all the time when these proceedings were going on, the complainant was absent, and had no notice thereof, and that Hawkins had full knowledge of all the facts; that the foreclosure suit went on to a decree, (Gould not appearing) but a guardian *ad litem* having been appointed for the infant defendant, and that the premises were sold under such decree in May, 1844, and were bid off by Gould for $1,025, who soon afterwards conveyed the same to Hawkins. That the complainant continued absent from Wisconsin until the summer of 1845, and

was ignorant of the said transactions of Gould; that Gould has, since his marriage with the said Mary, received and enjoyed the rents and use of the said premises, and that Hawkins has had the use and profit of lots 8 and 10 since his connection with the transactions above stated; that said lot 10 and dwelling house thereon, is worth $3,000, and that Gould and Hawkins have received in rents and profits some $2,000, and refuse to account, or pay over to, the complainant.

The bill prays for a conveyance of lot 10 to the complainant, and that the defendants Gould and Hawkins account for the rents and profits, &c.

To which bill the said defendants answered separately.

*Gould* answered that he admitted that a contract was made by the complainant with Wright and Knapp, at the time, in the manner and to the effect stated in said bill and in said contract of record, but denied that the complainant erected the said dwelling house on lot 10, and that said Mary and Elizabeth or either of them ever went into possession of said lot as either agents or tenants of the complainant, and admitted that the complainant paid $500 on said contract, and left the Territory of Wisconsin and resided out of it as stated in said bill.

Gould admits that the title to said premises was conveyed to said Janes with notice of said contract, but says it was previous to the same being occupied by Mary and Elizabeth. Admits that Janes conveyed the premises to Mary by deed, which is recorded as stated in said bill, and that Mary mortgaged the same to Janes, which mortgage was recorded as stated in said bill, to which record Gould refers.

Admits that he was married to Mary, February 6th,
1842, and went into possession of said premises, but
denies that Mary held the same as tenant or agent of
the complainant, or that he, Gould, had any knowledge
that the complainant or any one for him, pretended
that he had any interest in the premises.

Admits that the 1st year's interest on the $200
mortgage was paid previous to his marriage with Mary,
but says that Mary borrowed the money of one Barnes
to pay it, and that he, Gould, paid Barnes therefor
after his marriage.

Admits that said $200 mortgage was subsequently
paid, but says that it was sold and assigned to said
Wright and by him to one John Martin, and by Martin to said Gould, and by Gould pledged to John
Richards who foreclosed the same and it was paid by
a sale of said premises.

Admits that he contracted to sell lot 8 to Canfield
& Rublee as stated in said bill, and received pay therefor in the latter part of May, 1844.

Admits that said Mary bore a daughter to him on
the 16th day of June, 1843, that said Mary died 4 or
5 days thereafter, leaving said daughter the only child
of said Mary, that said child was named Mary Elizabeth and died about the first day of May, 1844.

Admits that he borrowed $400 of John Richards,
gave his note therefor, and that he and his wife executed a mortgage to secure the payment thereof, and
refers to the record thereof, but denies that he did so
with any intention of defrauding the complainant, but
solely because he needed the money to use in his business.

Denies that said Hawkins combined with him to
defraud or injure the complainant by purchasing lot

10, or in any other manner, or that Hawkins agreed with him that he should assign the $200 mortgage to said Richards, and that a bill should be brought to foreclose either the $200 or the $400 mortgage, or that there was any agreement or understanding whatever on the subject.

Says that at the time of his marriage with said Mary he had no knowledge or suspicion of any claims of any person on said premises, nor but that Mary was the sole owner thereof; nor had he any such suspicion until about 1843, when one William Whiting, the brother of the complainant, then residing somewhere in the State of New York came to Racine, and claimed on his own account an interest in the premises.

Says that at the time he married Mary, she was owing debts to about $100, which he paid, besides the $200 mortgage which he was compelled to purchase, and which with the interest amounted to about $228; that he paid taxes which were a lien on the premises previous to the sale to Hawkins to about $100; that he put $300 worth of improvements on the premises; that he supported said Elizabeth from February 6th, 1842, to June 1st, 1844, giving her her board, lodging, washing, clothing and medical attendance, she staying in his family till sometime in November 1843, when she went of her own accord and boarded first with one Lawrence and then with one Bush, at fourteen shillings per week, which said Gould paid.

Says that at the time he borrowed the $400 of Richards, he agreed to pay the solicitor's fees for foreclosing the same, and that July 29th, 1844, he paid the same, $40, to Strong & Palmer.

Says that inasmuch as said William W. Whiting had made claims on said premises on his account, and

he, Gould, could not pay the $400 mortgage without selling the premises, he assigned the $200 mortgage to said Richards as collateral security for the $400, and that a foreclosure was commenced on, the two mortgages, as appears by the papers in the suit, and that such proceedings were had thereon as appears by the papers and records of said suit.

Denies that he paid Richards any part of the principal or interest of said $400 mortgage previous to the sale by the master, but admits that the principal was not quite due at the time the bill was filed.

Denies that Richards did not seek payment of the $400 note when it should become due, and says, on the contrary, that Richards had notified him he should want the money when it became due, or as soon thereafter as possible, as there was a good bargain he could make in purchasing a farm ; and inasmuch as the loan was partly an accommodation loan, he assigned the $200 to said Richards, in order that said Richards might obtain his money at or near the time the same became due, and thereby the credit, honor and feeling of said Gould would be saved.

Admits that Richards had no interest in the $200 mortgage except to hold it as collateral for the $400 mortgage ; says that he cannot state whether the $200 mortgage and assignment was delivered to Richards personally, but knows that they were delivered to him or his solicitors, and denies that said Richards did not employ solicitors to foreclose said mortgages, and denies that the foreclosure was carried on wholly for the benefit of defendants, or either of them.

Says that he did not appear in said suit of foreclosure, or make any defence thereto, because he had no honest defence to make, and for no other reason.

Admits that Isaac Harmon, master in chancery, executed a deed of lots 8 and 10, as stated in said bill, and that he together with his wife, on the 13th day of May, 1844, executed and delivered a deed of lot 10 to said Hawkins, which was acknowledged and recorded as stated in said bill, but denies that it was to carry out any corrupt agreement between said Hawkins and himself.

Admits that himself and wife coneyed lot 8 to Canfield & Rublee, and that they conveyed the same to Hawkins, but denies any intent to defraud any person thereby.

Denies that there was any arrangement between himself and Hawkins whereby Hawkins was to procure said lots to be sold together, or whereby said Hawkins was not to bid upon the same ; denies that he or Hawkins did procure said lots to be sold together, and that Hawkins furnished him the money to bid on said premises, or that Hawkins paid any person any sum of money to permit this defendant to bid on said premises.

Admits that he received $1000 for lot 10 from Hawkins, and $100 for lot 8 from Canfield & Rublee.

Says at the time of the sale there was $400 due Richards and interest on the same from the time it was borrowed, and nothing more ; and that amount and nothing more was paid to said Richards, and whether or not there was any mistake in the master's computation of the amount due, he refers to his report.

Says that he does not know, is not informed, and cannot state, from belief or otherwise, whether the complainant remained ignorant of said master's sale, and of the sale to Hawkins while he was in Racine in 1845.

Admits that he occupied lot 10 from February 6th,

1842, to May 13th, 1844, by living in the house on the same, but denies that he ever received any other rents, issues or profits from said lot 10, or any at all from either of the other lots.

Denies that he ever received any rents from lot 10, or any part thereof, after he conveyed the same to Hawkins.

Admits that lot 10 and the improvements thereon are worth $3000.

Denies that the complainant ever applied to him and requested him to convey to the complainant said premises or any part thereof, or to account to him for the rents, issues and property thereof, or that any person for said complainant has ever made any such application or request.

Says that the contract made with Knapp and Wright was forfeited by reason of the complainant's not having erected the dwelling house and furnace mentioned therein.

Says that the dwelling house was erected, and the improvements made, by Mary, and paid for out of her private funds, and denies that the complainant erected the house, or made the improvements, or paid anything for them.

Says Janes deeded the premises to Mary because she erected the house, made the improvements, gave the $200 mortgage, and not because the complainant had any interest in the premises.

Avers and charges that if the complainant ever had any interest which was not forfeited, he either sold or transferred the same to said William W. Whiting, and that William W. Whiting now holds the same, or that he caused the title to be conveyed to

L*

said Mary for the purpose of injuring and defrauding his creditors.

Charges that the complainant, at the time he left the Territory, and for a long time after, was unable to pay his debts, and was utterly insolvent.

Says that the money paid by Mary for the house and fixtures, together with that paid by him for Mary's debts contracted before marriage, and to pay which Mary had no other property, and for the $200 mortgage, and for improvements and taxes upon the lots, and for the support of said Elizabeth, amounted to about $1500, which was much more than the fair market value of all the premises at the time they were sold; and that he was a mechanic, unable to spare the money from his business; that he proposed to said William W. Whiting, at the time he claimed an interest in the premises, in 1843, that he would convey the premises to him if he would repay him the money he had expended, without taking into the account the money expended by Mary before her marriage, which proposition said William declined to accept.

Admits that said Mary was the sister, and said Elizabeth the mother of the complainant.

Admits that a dwelling house was erected on lot 10, of the finish and dimensions, and within the time required by the contract, but says that it was erected by Mary for herself, and that she immediately took possession for herself and boarded and supported her mother; and that said premises were conveyed to said Mary solely for her benefit, and upon no other conditions than those expressed in the deed now on record.

Says there was no agreement made with the grant-

ees of either of said lots to re-convey them to him and Mary, or either of them, upon any conditions whatever; that he held out no inducements for Mary to join with him in either of said conveyances; that he used all the money obtained for said lots in his own business; that he has never accounted to any one for the same; that he never promised Mary and Elizabeth, or either of them, to preserve the complainant's interest in the premises; that he once wrote a letter to the complainant that the $200 mortgage was paid or bought, and what further said letter contained he could not recollect; that afterwards, in answer to a letter written by said William W. Whiting, inquiring what he would give for said William's and complainant's interest in the premises, he replied that he had paid out more than the premises were worth, and that if they had any right there, he would do what was fair by them, and that he does not recollect about any other writings concerning said premises.

Says that he never informed Hawkins that complainant had any interest in the premises, and does not know that any one did.

Says that the inducements held out to Mary to join him in the $400 mortgage were that he wanted the money in his tanning business, and no other.

Says that he never had any business transactions with Hawkins except as above stated; and that as to what Hawkins has said about his conduct in the premises, or what he, Gould, was about to do relative to complainants, or any other person's interest in the premises, or what information concerning the same may have been given to Hawkins, he is entirely ignorant.

Says that he purchased the $200 mortgage on the

13th day of August, 1842, paid the face of the same, principal and interest, entirely out of his own money, and that none of the same came from the complainant, or from the proceeds of the premises.

Says that at the time he purchased the $200 mortgage he procured it to be assigned to himself instead of being discharged, because he had already expended large sums of money in improvements on the premises, and the title being in his wife, he thought in case of his own death it was necessary to keep said mortgage in existence for the protection of his heirs, and stated the same substantially to Elizabeth, but whether he ever showed the same to any one previous to its assignment to Richards, cannot state.

Says that at the time he borrowed the $400 of Richards, the $200 mortgage was placed under his control and remained there until the sale, although the written assignment was not made until within three or four days before the foreclosure suit was commenced.

Says that he received of Richards $400 in gold on said loan, at the office and in the presence of Stevens and Wright, and promised to repay the same in gold, and all expenses of collecting, and that he did so, and that of the $1025 bid for the premises, the said $400 and interest and costs were paid to said Richards, and the balance retained by him; that the sale was fair and open; that the premises brought as much as they would at any public sale, and that they would not have brought more than $1150 at private sale.

Says there was nothing said between Hawkins and himself about the title of the premises, or any part thereof, or the sale of the same, or any part thereof, until two or three days before the master's sale, when

he and Hawkins entered into a written contract that he should sell lot 10 to Hawkins for $1000 as soon as title should be obtained on said foreclosure ; that said sale to Hawkins was made in good faith, and for the highest market value of said lot, and for a greater price than any other lot had sold for in the village of Racine ; that no one was interested with Hawkins in the purchase to his knowledge or belief, and that Hawkins paid nothing to any one to prevent their bidding, to his knowledge or belief ; and denies that he made any arrangement with the complainant's solicitors in the suit of foreclosure at the time of filing the bill, or afterwards, except to pay them for their services.

Says that at the time he made the contract with Hawkins no duplicate thereof was made, but the original writing was deposited with Strong & Palmer, and Hawkins at the same time deposited with them $1000 to be paid to Gould when the contract should be fulfilled, and that the deed to Hawkins, the master's deed, the principal, interest and costs due Richards, and the balance due Gould, were all passed over simultaneously as one act in the office of Strong & Palmer, they and the respective parties being present, and no one else.

Says he paid Hawkins $150 for rent of said premises after he sold them, and does not know what other rents he received for the same.

Says that one Lewis Smith, acting as attorney for some one in New York State, who claimed an interest in said premises as judgment creditor of said William Whiting at the time of said master's sale, forbid the sale, and afterwards, after a portion of the purchase money had been paid, said Smith, acting as

Dec. Term
1853.

Whiting
vs.
Gould.

such attorney, served a written notice on Hawkins, which he, Gould, has never since seen, setting forth, substantially, that all the pretended rights of the complainant had been sold and assigned to said William, and that the person for whom Smith was agent, had an interest in the premises as judgment creditor of said William.

Says that after said notice was served, he executed and delivered to Hawkins a bond to indemnify him against all costs and expenses which he might be put to in defending against the claim mentioned in said notice.

Says that he was a party defendant to the foreclosure suit, and that he did not give notice to any one of the pendency of the suit.

Says that at the time the contract was made with Wright and Knapp, the complainants, William and Mary, were the only children of Elizabeth; that Elizabeth was poor, and unable to support herself; that from the time the complainant left the territory until Mary married, Mary entirely supported Elizabeth, and was entitled to full compensation therefor from the complainant, and that William, from 1839, has been, and is insolvent.

Says that he sold each of the lots for the highest price he could obtain; that they were not rentable while in his possession, and that the rent of house was not worth more than fifty dollars per annum in the condition it was when he married.

Here follows the usual conclusion, denying all combination, &c.

Hawkins, answering, says he does not know, has not been informed, and cannot state from belief or otherwise, whether the complainant made a contract with

Wright and Knapp, as stated in the bill, or in any other manner; or whether he caused a dwelling house to be erected on lot 10; or whether Mary and Elizabeth, or either of them, went into possession of the premises, or any part thereof, as tenants or agents of complainant, or otherwise; or whether complainant left the territory, or where he resided, or whether Wright and Knapp conveyed the premises to Janes, or Janes to Mary, or whether Mary executed a mortgage to Janes; or what the consideration was, of any mortgage executed by her.

Admits that Gould was married to Mary, and had a daughter, and that both Mary and the daughter died as stated in the bill, but what Gould knew at the time of the marriage, relative to the matters stated in the bill, he does not know; nor does he know whether the first year's interest was paid on the $200 mortgage before the marriage, or whether the mortgage was paid before it was assigned to Richards, or whether Gould sold lot 7 to Norris or to any one.

Admits that he purchased lot 8 of Canfield and Rublee, but denies that he ever had a contract which they had made with Gould. Admits that Gould gave his note to Richards and that it was secured by mortgage as stated in the bill, but does not know as to the consideration of the note, or the knowledge of Gould relative to the matters stated in the bill, at the time he gave the note.

Says he does not know and cannot state whether Gould compelled Elizabeth to leave possession of the premises, or when, or whether she ever had possession.

Says that he never entered into co-partnership with Gould in the leather business and grocery business, or either—that he never had possession of lot 10 pre-

DEC. TERM
1853.

Whiting
*vs.*
Gould.

vious to his purchase—denies that he had any notice that the complainant had any right or interest in or to said premises, or any part thereof, or that he paid $500 for the same, or any other sum, or that he had taken any contract therefor, or that the same had been recorded, or that Mary and Elizabeth, or either of them, had been in possession of said premises or any part thereof, or that complainant had caused the dwelling and improvements to be put on to the said premises, or that said improvements or premises had been left in the care of Mary and Elizabeth as tenants or agents of the complainant, or that the complainant had been absent from the State, or that Gould had entered upon and held the premises as alleged in the bill, or in any other manner than as the husband of Mary, or that he procured the $400 of Richards in any other manner than as he, Hawkins, had above stated, or what Gould did with the $400, or any of it, or that Gould had received $123 from Norris, or any sum, or that neither Gould or Mary had paid any part of the consideration money for the premises, or that Gould intended to defraud the complainant— denies that he contrived with Gould to defraud the complainant, but says that about the month of May, 1844, he entered into a written contract with Gould to purchase said lot 10 for $1000, and pay the same as soon as Gould should purchase it upon a sale which was about to take place in the foreclosure suit of Richards—that he purchased said lot 10 in good faith without any knowledge or suspicion that complainant had any interest therein, and paid therefor $1000 which was the fair market value of it—that he had no knowledge of any arrangement between Gould and Richards as to the foreclosure of the $400 mortgage,

or the $200 mortgage, but supposed they were fore-

closed solely to collect the debt secured thereby— that the contract between him and Gould for the purchase of the lot was entered into only three or four days before the sale, and that before entering into it, he knew nothing about the foreclosure, or the mortgages, or the title to said lot.

Says he does not know whether at the time of filing the bill of foreclosure said Gould had paid Richards large sums of money, or any money to apply on said $400 mortgage, or whether any part of the same had become due, or whether Richards sought payment of the same, or claimed the right to foreclose, or whether he had any interest in the $200 mortgage, or whether he paid anything for it, or whether said mortgage and assignment were actually delivered to him in person, or whether he employed any solicitor to foreclose the mortgages, or either of them, or whether the prosecution was commenced or carried on at the solicitation of Gould, but denies that it was either commenced or carried on at his, Hawkins, solicitation, or that he had any knowledge of the same until he made the contract with Gould.

Denies that there was any understanding between him and Gould that Gould should not enter his appearance in said suit, or that he knew Gould did not appear in said suit, or was not to appear, or that there was any arrangement between Gould and him, that Gould should take any step in said suit, or that he knew what steps Gould intended to take except to purchase it at the master's sale.

Admits that the legal steps were taken in the foreclosure suit as stated in the bill, but denies that he had any knowledge of the intention of the parties—

admits that the master's deed was executed as stated in said bill—that Gould and wife, on the 13th day of May, 1844, conveyed to him, Hawkins, lot 10, and that the deed was acknowledged and recorded as stated in the bill, but denies that it was to carry out any fraudulent agreement between him and Gould.

Admits that Gould and wife conveyed lot 8 to Canfield and Rublee and they to him, Hawkins, but denies any knowledge of a design on the part of Gould to defraud complainant.

Denies that he made any arrangement with Gould, or any one else, not to bid on the premises, or that he procured said lots to be sold together, or that he paid any money to any person not to bid upon the same, or that he furnished Gould with any money to bid upon the same, but made a contract to purchase the lot, as above stated.

Admits that he paid $1,000 for lot 10 to Gould, but does not know what, if anything, Gould received for lot 8.

Says he does not know what was due on the $400 mortgage or the $200 mortgage at the time of the master's report, or whether he reported too much as due, or what he reported to be due, or whether he compounded the interest upon either, or whether Gould or any one paid anything to Richards for the $200 mortgage, or whether Gould retained the amount of the $200 mortgage in his own hands, or how much Richards received on the sale, or whether the complainant was ignorant of the master's sale and deed, and of the deed of Gould and wife to him (Hawkins).

Says that he has received for rent about $900, and expended for improvements about the sum of $400.

Admits the value of the property to be about $3,000. Says that he has had no business transactions with Gould, except as above stated. The first communication between them was at the time they made the written contract; that he never informed any one that Gould was about to defraud the complainant, or any one, out of said premises, or any part thereof; never communicated with any one on the subject, or received any communication from any one, except about the time he contracted with Gould, one Chester Bush informed him that he thought Elizabeth Whiting had some interest in the premises; cannot state whether this information was given before or after he made the contract; excepting also that one Lewis Smith forbid the sale of the premises at the master's sale, acting as attorney for some one residing in New York, who claimed an interest as judgment creditor of William Whiting; and that, after the sale, and after he had paid Gould a portion of the purchase money of the lot, said Smith, as such attorney, served a written notice on him, which he cannot now find, which set forth substantially that the pretended right of complainant had been sold and assigned by him to said William, and that the person for whom said Smith was attorney had an interest in the premises as judgment creditor of said William. The notice was served on him in the office and presence of Strong & Palmer, said Harmon and Gould being also present; denies that he had any interest in the loan made from Richards, or that he received the money thus loaned, or any part thereof; says that no one was interested with him in the purchase of either of the lots. He paid $1,000 down for lot 10, and $150 down for lot 8.

Says that after the notice was served upon him by

Smith, Gould gave him a bond to indemnify him against all costs and expenses he might be put to, in defending against the claim mentioned in said notice.

Says that he purchased said lots in good faith, without any notice that any other person had any interest in them, and paid therefor the fair market value in cash down, and bought the same solely for his own use. Denies combination, and closes in the usual form.

To which answers the complainant filed a general replication in the usual form.

The cause was heard at the April term, 1852. The testimony introduced on the hearing was substantially as follows:

*Deposition of Elizabeth Whiting, taken at Kalamazoo, Michigan, January 18, 1851, before Lyman Kendall, Commissioner:*

Elizabeth Whiting deposes that she is 86 years old on the 25th day of January, 1851, residing at Kalamazoo, Michigan. Complainant is my son; have but one other child living—David Whiting. My son William died at Racine, Wisconsin, in 1838 or 1839. I removed with my family to Racine county from Canada, in 1838. Ebenezer procured us a house at or near the Rapids, and we moved up there. The object of our going up to the Rapids was to make a pre-emption claim, and Ebenezer procured us this place, and furnished us with provisions, and was to have the benefit of the claim. My daughter Mary, after this claim was perfected, took the deed for the land so claimed, and was to hold it for the benefit of Ebenezer. I do not recollect how it was managed, but the title was in Mary for his benefit, in consequence of the trouble and expense he had been at for

the family, while obtaining the claim. It was subject

to a mortgage to one Slauson. Mary sold this land to one Eveland, towards paying for a house that was removed on to lot 10 in block 13, in Racine village, on Main street. She told Eveland, at the time of the sale, it was Ebenezer's property, and was to be put into the house on said lot for the benefit of her mother, for a home during her life, by the request of Ebenezer. I have heard Mary tell Gould that she got the house with some lands of Ebenezer's, and she traded the land by the request of Ebenezer. She told him this before they were married. Ebenezer, when he left for the east, left $50 in the hands of David to assist in building a house, and a part of this money was paid towards a house bought of widow Milligan, and that house was sold, and the proceeds applied in putting said house bought of Eveland on said lot 10, and repairing the same, and he left some money with me that was used towards fitting up said house ; the sum was $5 ; also Ebenezer left a demand against Slauson for lumber, which was put into said house. These things were told Gould by Mary before their marriage, and she objected to being married until these matters were settled between herself and Ebenezer. Ebenezer bought a lot on the east side of Main street ; according to my best recollection, it was called lot 10, in block 13 ; and two lots down on the flat near the river, near to where Gould afterwards built a tannery ; the lots were bought the same year Ebenezer went east, I think it was in 1839. He paid about $500 for the lot, and procured the house to be put on it, as I stated.

David W. Whiting deposed, that he was brother of the complainant ; that he had acted under a power

of attorney, or some writing, that made him the agent of the complainant to make some improvements on the premises, and that he did so. That very soon after making the contract for the purchasing the lots, the complainant left for the east, and remained absent about five years. That a proposition was made and agreed to by which the sum of $200 was to be paid to the vendors instead of the foundry agreed to be built; that upon such agreement, a deed was made to Mary of the premises, and she gave a mortgage thereon, to secure the payment of the $200; that the principal reason for making the deed to Mary was, that the complainant was absent; that the witness never paid anything for the lots; that Gould was aware, at the time of his marriage with Mary, that she did not really own the property, but that it belonged to the complainant. That when he (the witness) left Racine in the fall of 1840, he was insolvent.

This witness testified to other matters in detail, which it is not necessary here to notice, except that soon after the agreement to purchase by the complainant, and just before the complainant left for the east, he made and executed to the witness, for the consideration of $1,500, a written assignment, thereby conveying to the witness all the right, title, and interest of the said complainant in the bond or contract for a deed of the premises executed by Knapp and Wright to the complainant, which assignment was recorded December 5th, 1839.

There was other evidence tending to show, and showing the knowledge of Gould of all the facts and circumstances upon which the complainant's claim was based; also some evidence *tending* to show some notice on the part of Hawkins; also several letters from

Gould to David W. Whiting, recognizing the interest of the complainant and David W. in the premises. Also a deed of the lots in question from Lorenzo Janes and wife, dated July 28, 1840, for the consideration of $400 to Mary E. Whiting. Also a deed from Gould and wife to Hawkins for lot 10, for the consideration of $1000 ; also the original contract between Wright and Knapp, and Ebenezer G. Whiting, of the tenor and effect as set forth in the complainant's bill of complaint.

The defendant introduced and gave in evidence the assignment of the original contract for the purchase of the premises, made by Ebenezer G. Whiting, the complainant, to David W. Whiting, in consideration of $1,500, thereby conveying to the said David W. all the right, title, and interest of the said defendant, of, in and to the said contract made between Knapp and Wright of the one part, and the said complainant, of the other part, for the purchase and conveyance of the said premises ; which said assignment was recorded December 5, 1839.

The defendants also introduced evidence tending to show that the assignment of the contract aforesaid was made to defraud the creditors of the complainant; that the complainant was insolvent when he left the territory in 1839. Also evidence tending to show that Mary contributed to the building of the house, in accordance with the contract ; also evidence tending to impeach and counteract the testimony given on the part of the complainant. But it is not necessary to state the same in detail, as sufficient already appears to exhibit the facts passed upon by the court.

The cause was heard at the October term of the Racine Circuit Court, where a decree was pronounced

in favor of the complainant, in accordance with the prayer of the bill. From which decree the defendants appealed.

*Butterfield and Chase* for the appellee.

By the deed of Janes and wife to Mary Whiting, in the absence of respondent, she being in possession of the premises as the agent and tenant of the respondent, the consideration of the original purchase money being paid by respondent, Mary Whiting took upon her a trust estate in the premises, and held the same for the use and benefit of the respondent. 2 *Brigman's Di.* 618, § 13. "A purchaser of an estate in the name of another, not the wife or child, shall be deemed a trustee for the person advancing the money, unless the presumption from that circumstance is repelled by evidence." 6 *Brig. Di.* 618, § 13; 9 *Ves.* 360; 4 *Kent Com.* 307. "Property conveyed to A. to pay his debt, and to pay B.'s debt, due from the grantor, creates a trust." 5 *Barb.* 51. "Conveyances of an estate to B., the money being paid by A., B. is a trustee, and C. taking from him, with notice of the payment by A., would also be a trustee." 2 *Brig. Di.* 626, § 60; 15 *Ves.* 350.

"Two persons make a joint purchase in the name of one, *held* a resulting trust for the other." 2 *Brig. Di.* 626, § 63; 2 *Ves. & B.* 383; 1 *J. C. R.* 566.

"Where a man purchases an estate in the name of another, it is evidence of trust." 2 *Brig. Di.* 653, § 236; 16 *J. R.* 199; 2 *J. C. R.* 408; 3 *J. R.* 276; 2 *J. C. R.* 405; 6 *Cow.* 726; *Jeremy's Equity*, 19, 20, 28, 27, 142; 4 *Kent Com.* 407; 5 *J. C. R.* 388.

The defendant Gould, by his marriage with Mary, and entering into possession with Mary his wife, and

Elizabeth her mother, took upon himself the trust, and is bound to carry out the trust, even without notice of the trust. Notice to his wife is notice to him. 4 *Kent Com.* 307 ; 1 *J. C. R.* 566–575 ; 1 *Mars. Kent R.* 166 ; 2 *id.* 149 ; 1 *Cranch*, 100 ; 4 *J. C. R.* 136.

" The fact of notice is not always to be proved, but presumed from circumstances. 1 *J. C. R.* 575 ; 4 *id.* 136 ; 4 *Eq. Di.* 683, § 1, 2, 3.

" This is so, though the *cestui que trust* is wholly ignorant of the trust; yet when he is informed, may compel its execution and accomplishment." 4 *Eq. Di.* 683 § 3 ; 4 *J. C. R.* 136, 138, 139 ; 3 *id.* 261 ; 1 *J. Cases*, 205 ; 12 *J. R.* 275 ; 7 *Cranch*, 71.

The appellant Gould was bound by his marriage with Mary, and possession under her, to execute the trust she had assumed. 3 *J. R.* 499 ; 5 *Cow.* 124 ; 7 *id.* 323–5 ; 5 *id.* 129 ; 2 *T. R.* 53 ; 1 *id.* 760 ; 1 *Caine's*, 44 ; 2 *J. Ca.* 223 ; 3 *J.R.* 223 ; 2 *Brig. Di.* 630, § 98, 104; *id.* 631, § 110 ; *id.* 653, § 236 ; *id.* 654, § 242 ; 18 *Ves.* 149 ; 4 *Eq. Di.* 683, § 3 ; 1 *J. C. R.* 119 ; 6 *Am. C. L. Di.* 382, § 5 ; 9 *W.* 147 ; 3 *T. R.* 14 ; 1 *id.* 760 ; 4 *Kent*, 307, 179, 180.

The agency was joint, and required the assent of Elizabeth Whiting to carry it out, or alter the condition of the property. 4 *Kent*, 307, 179, 180 ; 2 *J. C. R.* 252, 230 ; 8 *Cow.* 574.

Gould could gain no interest in the estate under the Janes $200 mortgage. 1 *Eq. Di.* 147, § 1 ; *Jeremy's Eq.* 142 ; 4 *Eq. Di.* 679, § 9 ; *Rice's Eq.* 132.

It is a rule in equity, that if one comes into possession of trust property, with notice of the trust, he shall be considered as trustee, and, with respect to that property, is bound to the execution of the trust. It is also a principle of equity, that a trustee, with

M*

notice of his appointment as such, interfering with the subject matter, shall not be allowed to repudiate the trust.   4 *Eq. Di.* 679, § 9 ; *id.* 683, § 2, 3 ; 6 *Dana*, 176 ; 1 *Clark*, 464 ; 4 *Eq. Di.* 680, § 3 ; *id.* 681, § 1 ; *Hoff.* 192.

In *Green vs. Winter*, (1 *Johns. Ch. R.* 36, 41,) the chancellor says : " This purchase ought justly, and upon all sound principles of equitable policy, to enure to the benefit of the *cestui que trust*, and not to the benefit of the trustee.   A trustee is not permitted to use the information he gains as trustee by purchasing in for himself.   It would be an entirely wrong thing, as the lord chancellor said " (in *Morris vs. LeNeve*, 3 *Atk.* 37).   " The principle is the same as to buying in the trust estate, or *buying securities upon* it.   A trustee cannot act for his own *benefit* in a contract on the subject of the trust."   *Mont vs. Paske*, 2 *Atk.* 52; *Forbes vs. Ross*, 2 *Bro.* 430.

" In general, the *cestui que trust* is not bound by a decree rendered against his trustee in chancery, to which he is not a party."   4 *Eq. Di.* 683, § 3 ; 10 *Leigh*, 5 ; 2 *Ch. Di.* 94, § 19 ; 3 *Gill & J.* 168 ; 2 *Paige*, 77 ; 2 *J. Di. tit. Mortgage*, 111 ; 4 *Kent*, 102.

Hawkins was not an innocent purchaser, having notice of respondent's rights.   4 *J. J. Marshall's R.* 87, 90, 91 ; 5 *id.* 520 ; *Wright*, 245 ; 2 *Pet.* 178 ; 14 *J. R.* 63 ; *Dyer*, 108 ; 1 *Bald.* 464 ; 2 *J. C. R.* 62, 88, *et seq.* ; 3 *W.* 637.

The answer setting up new matter is no evidence against the plaintiff, who is not bound to contradict or rebut it.   10 *Pet.* 261 ; 14 *J. R.* 63, 74 ; 1 *Mumf.* 396–7; 10 *J. R.* 544–8 ; 2 *Wh.* 383 ; 3 *id.* 527 ; 6 *id.* 468 ; 1 *J. C.* 461.   It must be established affirmatively by the defendant, independently of his oath.

6 *J. R.* 559 ; 1 *id.* 590 ; 17 *id.* 367 ; 18 *id.* 532 ; 2 *J. C.* 87–90 ; 3 *id.* 583 ; 4 *B. & E.* 75 ; *Amb.* 589 ; 4 *Ves.* 404, 587. The plea or answer must state the deed of purchase, the date, parties and contents briefly ; that the vendor was *seized in fee* and in possession. The consideration must be stated, with a distinct averment that it was bona fide and truly paid, independently of the recital in the deed. Notice must be denied, previous to and down to the time of paying the money and the delivery of the deed ; and if notice is charged specially, the denial must be of all circumstances referred to, from which notice can be inferred, and the answer or plea *show how* the grantor acquired title. 10 *Pet.* 211, 212 ; 5 *id.* 718 ; *Sug.* 766–70 ; 1 *Atk.* 384 ; 2 *id.* 230 ; *Amb.* 421 ; 8 *Wh.* 449 ; 12 *id.* 502 ; 7 *J. C.* 67.

The title *purchased* must be *apparently perfect— good at law*—a vested estate in fee simple. 1 *Cr.* 100 ; 3 *id.* 133–5 ; 1 *Wash. C. C.* 75. It must be by a regular conveyance ; for the purchaser of an equitable title holds it subject to the equities upon it in the hands of the vendor, and has no better standing in a court of equity. 7 *Gr.* 48; 7 *Pet.* 271; *Sug.* 722.

"Notice must be denied, though not charged." 1 *J. C. R.* 302, 287 ; 3 *P. W.* 244 ; 1 *Viner*, 179 ; 2 *Vesey*, 454. In 1 *J. C. R.* 302, it is laid down "that the defendant was bound to deny fully, and in the most precise terms, every circumstance from whence notice could be inferred." (1 *U. S. Law Mag.* 492 ; 1 *Story's Eq.* § 395 ; *id.* § 398–99–97 ; 2 *Com. Di.* 638, 627, 4 *C.* 1 ; 1 *J. C. R.* 566 ; 2 *id.* 158 ; 10 *Ves.* 260–61–70.) And this is so, though the money be paid, provided it be before the deed is *executed.* (2 *Com. Di.* 628 ; 1 *Atk.* 382.) So if part be paid, and

bond for residue.  (2 *Com. Di.* 628, 627.  Denying notice at the time of execution, or of payment, is not sufficient.  (2 *Com. Di.* 627.)

The attorney who executed the papers, had notice. 1 *Story's Eq.*, *sec.* 408 ; 2 *Com. Di. Ch.* 4, *C.* 5 ; *Paige*, 627, 628 ; 4 *Wash. R.* 464 ; 2 *U. S. Dig.* 55, *sec.* 702 ; 4 *Com. Law Di.* 575 ; 5 *Barb. Rep.* 529 ; 2 *Hill*, 464 ; 13 *W.* 518 ; 2 *Com. Dig.* 629.

Hawkins and Wright purchased in partnership, and Wright knew—his knowledge is notice to Hawkins.  Notice to partner is notice to firm.  1 *J. Ch. R.* 450, 566.

A letter acknowledging trust is notice.  1 *J. Ch. R.* 432 ; 3 *Ves. Jr.* 707 ; 1 *id.* 74.

Parol evidence is admissible to prove trust in opposition to an absolute deed.  2 *Edwards' Ch. R.* 256 ; *Story's Pl. sec.* 768 ; *id. sec.* 784 ; 2 *Ves. & Bea.* 259, 262.

All proof of assignment by respondent to D. W. Whiting, and his insolvency and intent to defraud creditors, is out of the case, and the court cannot consider it or adjudicate upon it, nor found a decree thereon, because there is no averment in the pleadings nor issue as to that matter.

The evidence must apply to the issue, and if the depositions are as to *facts not* in *issue*, they will not be permitted to be read.  2 *Mad. Ch.* 438 ; 11 *Ves.* 240 ; 11 *Vinor*, 484 ; 2 *Chancery Cases*, 196.  On the same ground no notice will be taken of evidence by which it is attempted to introduce a defence totally different from that made by the answer.  2 *Mad. Ch.* 438 ; 12 *Vesey*, 580 ; *Story's Eq. Pl.*, *sec.* 36, 852 ; 3 *Eq. Dig.* 140, *sec.* 8 ; *Com. Dig. Ch. R.* 2.

It is an undeniable principle that the decree of a

Court of Equity must be founded on some matter put in issue between the parties; the examination of witnesses must be confined to facts asserted on one side and denied on the other. 6 *J. R.* 559, 560, 564 ; 19 *id.* 505 ; 2 *Cow.* 734 ; 8 *id.* 579 ; 7 *Barb. R.*; where our case is decided as to this point in the clearest manner.

If the contract was assigned to William Whiting, as alleged in the bill, or, as proved, to D. W. Whiting. It is not alleged that D. W. Whiting, nor is it proved that D. W. Whiting, paid the purchase money for it ; but it is proved he did not pay. So by the law of lien in equity, respondent can follow the property into Hawkins' hands, it being in trust for the purchase money. 2 *Story's Eq.* 462, *secs.* 1217 *to* 1233, *inclusive;* 4 *Kent's Com., sec.* 58, *page* 151 *to* 154, 3*d edition.* And this is so though the contract acknowledges the receipt of the money, or receipt is given, &c ; and it lies on the purchaser to show the lien was waived. 2 *Story's Eq. p.* 479. *Note* 15 *Ves.* 329 ; 1 *J. Ch. R.* 308, *cited in note on page* 479.

As to declarations made by persons in possession, &c., *see* 10 *Paige*, 180 ; 1 *Cowen & Hill's Notes*, 644.

*Randall & Ryan*, for the appellant,

I. The complainant can only recover upon the case made by his bill. *Story's Eq. Plead. sec.* 257.

II. The facts in this case do not show a resulting or implied trust in favor of the complainant in the premises in dispute. 4 *Kent*, 305 ; 15 *Wend.* 647–50 ; 2 *J. C. R.* 400 ; 5 *id.* 1 ; 6 *id.* 111 ; 1 *Paige*, 494 ; 2 *id.* 218–40–51–65 ; 3 *Sumner*, 438–461 ; 2 *Atkyns*, 150 ; 1 *Barbour C. R.* 499.

III. Parol evidence is inadmissible to vary or con-

tradict written istruments, except in cases of fraud or mistake, or to raise trusts. 1 *J. C. R.* 425-429 ; *id.* 273-280 ; 2 *id.* 555 ; 5 *id.* 1 ; 1 *Brown R. C.* 92 ; 11 *Paige,* 650 ; 1 *id.* 494 ; 9 *Dana,* 108 ; 2 *Brown C. R.* 219 ; *Leading Cases in Equity, Pt.* 1, *p.* 572–592 ; *Story's Eq. Jurisprudence,* 2 *sec.* 1195-7-99 ; 5 *Cushing,* 90–92 ; 10 *Paige,* 559 ; *Lewis on Trusts,* 111–113 ; 6 *Vesey,* 39.

IV. The statute of frauds prohibits not merely the proving, but the granting, declaring or passing any interest or estate in lands, or trust or power on the same, except by instrument in writing. *Rev. Stat. of* 1839, *p.* 162, *sec.* 6 ; *Lewis on Trustees, p.* 44, *note* ; *Roberts on Frauds,* 91–94 ; *Leading cases in Equity, V.* 2, *Pt.* 1, *p.* 572.

V. The complainant having conveyed his property, for the purpose of defrauding his creditors, cannot come into a court of equity to recover it back again. *Story's Eq. sec.* 311–880.

VI. Gould, by marriage, became a purchaser for a valuable consideration. 8 *Wend.* 1–33 : 8 *Ves.* 859.

VII. It is not shown that Gould had notice of complainant's interest before his marriage.

VIII. Hawkins was a bona fide purchaser without notice. *Leading cases in Equity, V.* 2, *Pt.* 1, *p* 145 ; *id.* 149 ; 8 *Gowen,* 260 ; 3 *Vesey,* 478–85 ; 2 *Watts,* 78–80 ; 2 *Sumner,* 155-2-4 ; 8 *J. R.* 141 ; 26 *Maine,* 484.

*By the Court,* CRAWFORD, J. After a careful examination of this cause, we are unable to find any-thing in it which would warrant a decree in favor of the complainant. Independent of the objection that there is a palpable variance between the case made

by the bill, and that which is sought to be establish-ed by the proofs, it is impossible to discover the existence of a trust, either express or by implication, enuring to the benefit of the complainant. By his original contract with Wright & Knapp, he acquired no estate in the lots in question, but merely a *chose in action*, which upon performance of the conditions imposed upon him by that contract, he might enforce by a bill for specific performance, and until he had, by the construction of the dwelling house on one of the lots, and the furnace on another, entitled himself to a conveyance, his equitable interest in the property, was not such as to be enforced in equity. *Bogert vs. Perry*, 17 *John.* 354. Upon the making of the contract, there was certainly no trust estate created for the reason that neither the whole consideration, nor any aliquot part of it, had been paid, and the contract remained executory.

But within a few days after the making of this contract, the complainant executed an absolute transfer or assignment of the same, and of all right and interest to which he might become entitled by virtue thereof, to his brother David H. Whitney, which assignment recited a consideration, (fifteen hundred dollars). There is no declaration in this assignment that it is made in trust, but *parol* proof is introduced to show that the assignment was intended for the benefit of the complainant, and was without consideration. If there was any pretence that through fraud or mistake, and against the intention of the parties, the recital of a valuable consideration found its way into the instrument, there can be no doubt that a court of equity ought to admit parol evidence of the absence of such consideration, but unless such fraud or

*margin:* Dec. Term 1858.

Whiting *vs.* Gould.

DEC. TERM 1853.

Whiting
vs.
Gould.

mistake is shown, proof of this kind is inadmissible for the purpose of destroying the effect of the assignment. (*Vide Wilkinson vs. Wilkinson*, 3 *Devereux's Eq.* 376; *Franklin vs. Roberts*, 2 *Iredell's Eq.* 500; *Kelly vs. Bryan*, 6 id. 283; *Stephens and others vs. Cooper and others*, 1 *John. Ch.* 425; *Movan vs. Hayes*, 1 id. *Ch.* 339; *Morris vs. Morris*, 2 *Bibb*, 311; *Morse vs. Shattuck*, 4 *N. H.* 229; *Belden vs. Seymour*, 8 *Conn.* 304; *McCrea vs. Purmont*, 16 *Wend.* 460; *Wilt vs. Franklin, assignee*, 1 *Binney*, 502; *Allison vs. Kurtz*, 2 *Watts*, 187; *Leman vs. Whitley*, 4 *Russ.* 423.

There is no objection to this document on the ground of fraud, mistake or surprise, and the parol proof of a want of consideration, which would render an effective transfer a mere voluntary conveyance, is therefore insufficient and improper. Nor can it be shown by *parol*, that the transfer which completely vested in David W. Whiting, all of the interest of the complainant, was intended nevertheless to be in trust for the use and benefit of the latter. At the time of the execution of the assignment, (February, 1839,) the statute of Michigan "for the prevention of frauds," was the law in force and applicable to the transaction. The eleventh section of that statute declares, "that all declarations or creations of trusts or confidence of any lands, tenements or hereditaments, shall be manifested or proved by some writing signed by the party" able to declare such trusts, or they shall be utterly void. (*Stat. of Mich.* 252.) This statute created a rule of evidence applicable to trusts in lands, by requiring that they should be *manifested or proved by some writing*, and as there is no such evidence of a trust in this transaction, we must hold that

Dec. Term 1853.

Whiting vs. Gould.

it was not competent to establish it by parol proof, for that would be a virtual abrogation of the statute of frauds. *Vide Steere et al. vs. Steere et al.*, 5 *John. Ch.* 1; *Movan vs. Hays, id.* 339; *Lord Irnham vs. Child*, 1 *Bro.* 92; *Portmore vs. Morris*, 2 *Bro.* 219; *Stevens vs. Cooper*, 1 *John. Ch.* 425; *Hare vs. Shearwood*, 1 *Ves. Jr.* 241; *Hutchinson vs. Tindall*, 2 *Green's Ch.* 357; *Botsford vs. Burr*, 2 *John. Ch.* 404–415.

The provisions of the statute of frauds do not apply to *implied trusts*, or those which are raised or created by operation of law, and not from the agreements or contracts of the parties, which would render the *trusts express*. The latter come within the intention and words of the statute which requires that all such agreements shall be in writing, but the former are not affected by the statute. It is hardly necessary to remark, however, that in the transaction between the complainant and his brother David, there is no ingredient of an implied or resulting trust. The assignment must be taken to have been for a valuable consideration, and its effect was to divest the complainant of all interest, legal or equitable, in the contract with Wright and Knapp, or in the property.

It appears that in 1839 or 1840, the title to the lots in question vested in Lorenzo Janes, and that the portion of the original contract which provided for the building of a furnace on one of the lots, was by the consent and desire of David (who claimed to be the owner or assignee of the contract,) changed, and instead thereof, Mary E. Whiting, who was then unmarried, agreed to take a deed of the premises from Mr. Janes to her, and to give a mortgage on the same to secure the payment of two hundred dollars. In pur-

suance of the agreement, the property was conveyed by Janes and wife to Mary, who executed a mortgage thereon, securing the payment of two hundred dollars to Janes. We thus find that the actual consideration for this property consisted of five hundred dollars, paid in the first instance by the complainant, but which payment enured to the benefit of David by the assignment, two hundred dollars secured to be paid by Mary, and the labor and expense incurred in the erection of the dwelling house on one of the lots, which seems, by the proof, to have been contributed by the complainant and David ; but in what proportions, or to what amount, is not clearly shown.

It is claimed that the title was conveyed to Mary E. Whiting "for the use and benefit of the complainant"; in other words, that she acquired the property as trustee for her brother, the complainant. If the intention, at the time, really was to secure the estate to Ebenezer (the complainant,) as the person equitably entitled to it, the parties to the transaction were most unfortunate in omitting all efforts or means to express such intention, for we here find the only person who could legally insist on any right under the first contract voluntarily abrogating it in part, and participating in a new arrangement, by which the title was to vest absolutely in Mary, and she alone was to secure the payment of the sum thereby agreed to be paid. The deed from Janes and wife to Mary E. Whiting bears date the 28th day of July, 1840, and at that time the Statute of Michigan for the prevention of frauds had given place to the Statute of the Territory of Wisconsin, "to prevent fraudulent conveyances and contracts relative to real and personal property." The sixth section of this statute provided

that no trust or power over, or concerning lands, or in any manner relating thereto, should be *created,* *granted or declared,* unless by act or operation of law, or by deed or conveyance in writing.

Under this provision of the statute, an *express* trust could be created by deed or conveyance only, and not by *parol,* while an *implied* or *resulting* trust might be raised or created by the operation of law, and *proved* by parol, for the obvious reason that the latter kind of trust has its origin, not in the agreement or contract of the parties, (which must be in writing,) but in the absence of all such agreement, and arises out of the transaction merely. The latter is but the creature of equity, the former is the result of compact; and although a trust by operation of law is not affected by the statute of frauds, it is now, as it was before the enactment of the statute, entirely inconsistent with even a bare declaration of the trust by parol. *Expressum facit cessare tacitum.* (See *Lord Bellasis vs. Compton et al.,* 2 *Vernon,* 294.

We may here remark that it is not pretended that a trust relating to this property, and in favor of the complainant, was at any time created or declared in writing; but we are called upon to find and establish from the proofs, a resulting or implied trust. If this cannot be done, the whole case fails.

It cannot, we think, escape observation, that the proof throughout has relation to parol agreements and arrangements between the parties, having for their object the preservation of the complainant's interests, notwithstanding their inconsistency with the written instruments. We have already stated that such agreements are insufficient to create a trust, or to vary the effect of a deed or contract in writing, and

hence we will dismiss any further consideration of a trust arising from agreement or contract, with the remark, that an agreement cannot rest partly in writing and partly in parol, because the written contract extinguishes any previous parol agreement, in the absence of fraud or mistake; and furnishes the most reliable evidence of what was intended by the parties. *Vide Mumford vs. McPherson*, 1 *John*. 414; *Parkhurst et al. vs. Cortlandt*, 1 *John. Ch.* 273, *and cases there cited.*

If we correctly understood the counsel for the complainant, it is claimed that a trust results to him from the payment of the consideration, and if the principle were opposite to the case, there would be little difficulty in disposing of it, for ever since the case of *Dyer vs. Dyer*, 2 *Cox*, 92, decided by Lord Chief Baron Eyre in 1788, in accordance with all the prepreceding cases, it has not been questioned, "that the trust of a legal estate, whether freehold, copyhold or leasehold, whether taken in the name of the purchaser and others jointly, or in the names of others without that of the purchaser, whether in one name or several, whether jointly or successively, results to the man who advances the purchase money."

But there are insurmountable objections to the application of this principle to the present case. The whole consideration for the property was not originally paid by the complainant; he advanced five hundred dollars, and agreed by his contract with Wright & Knapp, to erect a dwelling house and a furnace on the property, the cost of which was not at the time defined, nor has it yet been shown what the cost of the erection of the dwelling house has been, for the evidence on this subject is not such as to ena-

Dec. Term 1853.

Whiting vs. Gould.

ble us to compute the amount expended. It may perhaps be urged that such expenditure was calculated to increase the value of the property, and this is true; but at the same time it may have been important and beneficial to the vendors of the lots, who perhaps were owners of adjacent property, and at all events the construction of these buildings was none the less a portion of the consideration, equally obligatory upon the purchaser, as would be the payment of a further sum of money. *See Sayre Tvs. ownsend*, 15 *Wend.* 647.

By the subsequent agreement, at the time of the conveyance of the property to Mary E. Whiting, she gave a bond for the sum of two hundred dollars, and secured the payment thereof by a mortgage of the property, as a further consideration for the purchase, and we can find no evidence that the complainant ever paid any portion of this sum. It is insisted, however, that the two hundred dollar bond was paid by a sale of a part of the property; but it is idle to contend that a resulting trust from the advance of the purchase money, can be thus raised by something like reimbursement, long after the execution of the deed by which the estate vested in the alleged trustee. The trust must have sprung into existence (if at all) cotemporaneously with the deed, and if the consideration for the conveyance consisted, in whole or in part, of a credit given to Mary, no subsequent tender or reimbursement could have a retrospective effect to produce a resulting trust to the extent of such credit. Chancellor Kent, in *Botsford vs. Burr*, (2 *John. Ch.* 405,) while discussing this subject, says, "The trust must be coeval with the deeds, or it cannot exist at all." "The trust results from the original transaction

at the time it takes place, and it is founded on the actual payment of money, and on no other ground. It cannot be mingled and confounded with any subsequent dealings whatever."

The same principle is declared in *Rogers vs. Murray*, (3 *Paige*, 398,) by Chancellor Walworth, and in the elaborate opinion of Chancellor Jones, in *White vs. Carpenter*, (2 *Paige*, 217–238.)

How can the court ascertain the precise portions of the consideration furnished by the different contributors, so as to determine the exact quantity of the estate to be decreed to each? For it is certain, that independent of the payment of five hundred dollars, made by the complainant when he obtained the contract from Wright and Knapp, Mary and David must be considered as furnishing portions of the consideration; the former by her bond, and the latter by his work and labor in the construction of the dwelling. As to the necessity of showing some definite portion of the consideration, *vide Sayre vs. Townsend*, 15 *Wend.* 647 ; *White vs. Carpenter, supra; Smith vs. Burnham*, 3 *Sumn.* 466.

We think it is impossible to say how much of this estate ought to be awarded to each of these parties, even if it were clearly shown that a trust existed in favor of all of them, and it is not the duty of the court to supply, by a mere arbitrary allotment, this defect in the case.

Again, the complainant can claim no trust, by implication, from the payment of any part of the purchase money at the time of the conveyance. After the assignment of his interest in the contract for the lots, to his brother, David W. Whiting, the complainant was, for all the purposes of the present case, a

stranger to the transaction, and the payment which he had made enured to David, who may be considered the person furnishing the amount so previously paid towards the purchase, at the time the deed to Mary E. Whiting was given. *Vide Jackson vs. Morse*, 16 *John.* 197. Hence, we are led to conclude that the complainant cannot be deemed to have advanced any part of the consideration for the property, unless we permit his assignment to be affected, and its efficacy impaired, by parol proof of a want of consideration.

It follows then that a trust resulting from the payment of the consideration, could only have been in favor of David W. and Mary E. Whiting, in proportion to the share of consideration furnished by each of them.

But by reference to the testimony of David W., (who was examined as a witness in the case,) we find that he claims to have acted as the agent of the complainant in the arrangement whereby the lots were conveyed to his sister, Mary, by Mr. Janes, and assuming this to be true, and (as he swears) that " he had no personal pecuninary interest in these lots," although Mr. Janes testifies that he professed to be the owner of the original contract, and entitled of course to all benefits from it, and as such had actually revoked and changed it in some respects, how can it be claimed that any trust would result to him ? He disclaims all interest in the property, (notwithstanding his attempt on another occasion, to render it liable as his own for the payment of his debts, by virtue of the assignment by the complainant to him,) and the intention of both Mary and David, it is insisted, was to take the title for the benefit of Ebenezer. Here then is a complete

overthrow of everything like an implied trust in favor of David, because such a trust will never be decreed against the intention of the parties ; (*vide White vs. Carpenter*, 2 *Paige*, 217–265;) and having already seen that that the complainant cannot be considered as furnishing any part of the consideration for the deed to Mary, he is not at liberty to show by parol that the conveyance was intended for his benefit. (See *Botsford vs. Burr*, above cited.)

We may here remark that David's testimony is sufficient to destroy any implied trust in his favor, because where a trust may be shown by parol proof, it may also be rebutted or extinguished by the like kind of proof ; its existence or non existence may thus be shown. (*Vide Walker vs. Walker*, 2 *Atk.* 98 ; *Roe vs. Popham, Doug.* 24 ; *Botsford vs. Burr, supra ; Stere vs. Stere*, 5 *John Ch.* 1, 18.

From the view which we have taken of the case, it follows that neither the complainant, nor his brother David, had a trust estate in the property, and consequently the latter had no interest therein which could pass to the former by the transfer of the 20th March, 1850. The whole estate had vested in Mary long before that time, and had come under the control of her husband, (the defendant Gould,) by whom it was afterwards sold to the defendant Hawkins, before David attempted to reconvey to the complainant. And even if David had a trust estate which he might convey to the complainant, still this would not entitle him to relief on the case made by his bill, for he does not claim as the assignee of David, but as the original *cestui que trust.*

In relation to the letters of Gould, introduced in evidence, we have only to say that without dealing in

conjecture, no court could give them any certain ap-
plication to the property, or hold them to be evidence
of any interest therein, in the nature of a trust in
favor of the complainant, or any other person. They
are addressed to David W. Whiting, and seem to
have been written in that spirit of affection and
confidence which is so very becoming in the inter-
course of members of the same family. But they are
entirely insufficient to establish the trust which is
claimed in this case, and we cannot better dispose of
the subject than by reference to the history of the
case of *Stere and others vs. Stere and others*, 5 *John.
Ch.* 1, and to the opinion of the learned chancellor
in that case, for ample reasons why the letters of
Gould should have no influence in the present case.
"It would be injurious to that freedom of intercourse,
and to the operation of those kind and generous af-
fections which ought to be cherished in the circle of
the domestic connections, to make such deductions
from loose and general expressions in a confidential
correspondence between one member of a family and
another, and to give them the force and vigor of legal
obligations."

In the argument of this case much stress was laid
upon the fact that the defendants had not insisted
upon the statute of frauds, by plea or answer, as a de-
fence. We cannot appreciate the objection. The bill
merely sets up the trust in favor of the complainant,
and does not contain any averment that it was created
by deed or otherwise, as indeed it was unnecessary it
should, because the court would intend that it was
created in the manner required by law, unless the
contrary appeared. In their answers, however, the
defendants deny the existence of any trust, so that

N*

upon this issue, we think, it was incumbent on the complainant to prove the creation or existence of the trust by competent evidence. On this subject, from an examination of the authorities, we believe the rule may be stated thus: If a defendant admits an agreement or trust, but insists on the statute of frauds as a defence, the court will not permit his admission to override the positive provisions of law, unless the statute is sought to be made a cover for fraud, and will not decree against the defendant; but if, after admitting the agreement or trust, he does not rely, by plea or answer, on the statute, a decree may be rendered against him, because he may be deemed to have renounced the benefit of the statute, and no objection to the nature of the proof can be offered, because the agreement or trust is admitted, and no proof of any kind is required. But if, as in this case, the statement of a trust, or agreement, is met in the answer by a denial, and the complainant finds it necessary to support his bill by proof, he must show a trust or contract, as the case may be, evidenced by writing, and if he fail to do so, his case in that respect must fail. (*Vide Talbot vs. Bowen*, 1 *A. K. Marsh Rep.* 437; *Cozine vs. Graham et al.*, 2 *Paige*, 177; *Ontario Bank vs. Root*, 3 *Paige*, 478; *Harris vs. Knickerbocker*, 5 *Wend.* 638; 6 *Vesey*, 39.)

It is unnecessary to discuss the mode of pleading the statute, and supporting the plea by an answer in cases of trusts, as distinguished from cases of specific performance, where the trust or agreement insisted upon is admitted in the answer. On this subject see *Story's Eq. Pl.*, *p.* 766–7, *and note* 1.

But there can be no difference in the kind of proof necessary, where the trust or agreement, as the case

may be, is denied. We do not feel called upon, in

the present case, to consider the question whether the notice of an outstanding equity received by the defendant Hawkins before and about the time of his purchase, was such as to affect him. If it were necessary to do so, the notes to the case of *Le Neve vs. Le Neve,* (*White & Tudor's Equity Cases, vol.* 1, *part* 1, *p.* 21,) furnish a copious reference to the English and American decisions on the subject.

For the reasons above given, we are of the opinion that the complainant has not shown himself entitled to the relief which he seeks as *cestui que trust,* and that therefore the decree of the Circuit Court in this cause ought to be reversed, and the bill dismissed.

SMITH, J. I fully concur in every view which my brethren have taken of this case, and while the views just uttered are entirely conclusive in regard to the decree to be pronounced, another objection to recovery by the complainant has been so strongly impressed upon my mind that I deem it proper to state it here, as it also is fatal to the complainant's case.

Ebenezer G. Whiting entered into contract with Wright and Knapp for the purchase of the land mentioned in the complainant's bill, and paid $500 of the purchase money. On the performance of the other conditions or terms of the contract, he would become entitled to a deed. On the performance of these terms, had he directed the title to be taken in the name of Mary, or any other person, such person would become a trustee by implication of law. Or, in other words, a trust would have resulted from these transactions, in the holder of the title thus acquired, for the use of Ebenezer. But a few days after the execu-

tion of the contract of purchase, Ebenezer sold and assigned the contract to his brother, David W., who was the holder of it at the time when the deed was made, and had the right to give direction to the title to be conveyed by the vendor. David's right, as the purchaser of the contract, was not identical in all respects with that of Ebenezer, the purchaser of the land. The money of Ebenezer was invested in the land; the money of David was invested in a chose in action. From the former transaction a trust springs; from the latter it does not.

If A. purchase land of B. and pay his money for it, and takes the title in the name of C., a trust results, by operation of law, in C. for the use of A. This trust arises not from the agreement, but from the transaction of the parties. It flows or results from the payment of the money into the land.

If A. purchases land from B. and pays him the price, and instead of taking a deed for the same, takes an agreement to pay at some future day, and at maturity of the contract has the title taken in the name of C., here also results a trust in C. for the use of A., because the trust springs from the payment of the money by A. for or into the land. But if A., before the maturity of the contract, sells and assigns his contract to D., and at maturity D. directs the title to be made in the name of E., here no trust results by operation of law, because D. has paid no money for the land, but only for a chose in action, which is not the subject of a resulting trust. He invested his money, not in the land, but in the contract which would enable him to demand the title for himself or his assigns. If he directed the deed to be made to E., the latter might be a trustee of D., and if the trust were declared in

writing, it would be valid; but vesting in parol, or,

which is the same thing, tacit understanding, would be void by the statute of frauds.

I by no means deny that a resultant trust, already vested, may be assigned. But I do deny that the transactions of one party, out of which a trust may spring at a future day, may be beneficially transferred to another; or, in other words, that the parties may be so transmitted that the one may take the place of the other by the mere act of bargain and sale.

Whenever a trust results by operation of law, it does so independent of contract. It is the vital energy of the law, called into operation by the transactions of the parties; it is the equitable spirit of the law, springing out of the land in behalf of him, who has invested his money therein. In its very nature it is contradistinguished from the rights and interests which arise out of contract. For this reason a resulting trust need not be evidenced by writing.

Every interest which the assignee of the agreement to convey the land possesses, rests and necessarily rests in contract, and in nothing else. He has performed no act that does not rest for its verification in contract. As no trust had vested in the original vendor at the time of his assignment, he could pass none to his assignee. As an implied trust results from the transaction of the parties, and not from their contract, there can be no contingent or inchoate trust of that class. When the original vendee, who has paid the purchase money and taken a contract, assigns that contract before the deed is due, he thereby extinguishes every possibility of a trust resulting from *his* transaction. As all of the rights of his assignee arise out of his contract of assignment, it follows that any

Dec. Term
1853.

Whiting
vs.
Gould.
possible trust that can accrue to him must also arise out of his contract, and if he would place the title which would accrue to him in a trustee, it is apparent that any such relation must likewise be created by contract, and of course must be in writing.

The application of these principles and doctrines to the case under consideration, is fatal to the complainant's bill of complaint.